JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} A Cuyahoga County Grand Jury indicted defendant-appellant Lorenzo Locklear on one count of drug trafficking, with a one-year firearm specification, one count of drug possession, and carrying a concealed weapon. After the trial court denied his motion to suppress, Locklear pled no contest to the indictment and the trial court sentenced him to 18 months incarceration. Locklear appeals from the trial court's judgment denying his motion to suppress. Finding merit to his appeal, we reverse and remand.
 {¶ 2} The indictment stemmed from an incident that occurred late in the evening of June 4, 2007. The record developed at the suppression hearing reflects that Cleveland police responded to 3179 East 123rd Street to investigate a citizen complaint of drug activity, fighting, and loud music. Cleveland police detective Anthony Spencer testified that the police were familiar with the area where the house was located because of previous arrests for drug activity near the home and frequent reports of gunfire in the area.
 {¶ 3} Spencer testified that as he pulled up to the house, the yard was "well-lit" and he could see 12 to 13 people "milling about" on the lawn and porch of the home, but no one was fighting. Spencer pulled his car to the curb (followed by three other police cars), rolled his window down, and asked what was going on. One of the males responded, "it's over," and Spencer testified that he and his partner, Cleveland police detective Sims, assumed the male was referring to the fight that had been reported. Spencer observed that "a few of the males seemed agitated," and one of them started walking towards the house. Spencer, who had not yet gotten out of his car, asked the male to stop, but he continued walking onto the *Page 4 
porch and into the house. All of the police officers then got out of their cars and surrounded the front yard.
 {¶ 4} Spencer testified that he "didn't really have enough" to follow the male into the house, so he went to the back of the house to see if the male came out there. Spencer testified that when the male came out the back of the house, he detained him and walked with him to the front of the house. According to Spencer, at that point, the police "still hadn't seen anything concrete." But, Spencer testified, because the officers were "concerned that someone in the group might have weapons" and the police did not believe the two individuals who said they lived at the house, "we just decided to check everybody to ID them." Spencer testified that the officers then patted-down everyone for officer safety before the officers checked their identification. According to Spencer, it was during this pat-down that detective Sims found a gun in Locklear's pants pocket. But our review of the record reveals a curious inconsistency in Spencer's testimony. On redirect, Spencer testified that when he got out of his car and went around the back of the house, he returned with the male "maybe one to two minutes" later. He also testified that "when Detective Sims first located the gun, he shouted gun; so although I wasn't in the front, I heard it in the rear. It's one of the standards that we do." This testimony clearly contradicts Spencer's testimony that Locklear and the others on the porch were patted-down after Spencer returned from the rear of the home and only because the officers could not determine who lived at the home. Spencer's testimony on cross-examination confirms that the gun had already been found by the time he came around from the back of the house: *Page 5 
 {¶ 5} "Q. You came back around with that gentleman now probably in custody?
 {¶ 6} "A. Yes.
 {¶ 7} "Q. And Sims is asking you to take Locklear, who is now in handcuffs. Behind his back or in front of him?
 {¶ 8} "A. Behind his back.
 {¶ 9} "Q. Which is customary?
 {¶ 10} "A. Yes, sir.
 {¶ 11} "Q. And he asked you to put him in the cruiser?
 {¶ 12} "A. Yes.
 {¶ 13} "Q. So you have no idea what Sims might have said to him or to any other people upon on the porch, because Sims is the one who went up on the porch I assume?
 {¶ 14} "A. Correct.
 {¶ 15} "Q. To pat down or whatever he did?
 {¶ 16} "A. Right. I did hear Sims shout-
 {¶ 17} "Q. Your only involvement with this young man was to take him from Sims' custody to the cruiser, to your car?
 {¶ 18} "A. Yes." (Emphasis added.)
 {¶ 19} In light of Spencer's testimony that he was at the back of the house when Detective Sims discovered the gun, Locklear's testimony is extremely credible. Locklear testified that he was sitting on the porch with four other people when the police pulled up. *Page 6 
He testified further that although two individuals had been arguing earlier at the street corner, the argument was over and no one was fighting. There was no loud music or yelling.
 {¶ 20} Locklear testified that when the police got out of their vehicles, Detective Sims walked up to the porch with his hand on his gun and told the males to put their hands on the wall so he could search them. Locklear testified further that when one of the males asked Sims why they were being searched, Sims responded, "we got a call for loud music."
 {¶ 21} Spencer testified that after Locklear was handcuffed and read his rights, Spencer escorted him to a police car. On the way to the car, Spencer asked Locklear if he had "anything else on him that could get him into trouble," and Locklear told Spencer that he had some "rocks" in his pocket. Spencer then pulled the "rocks" of crack cocaine out of Locklear's pocket. Locklear denied that anyone ever gave him hisMiranda rights.
 {¶ 22} In denying the motion to suppress, the trial court found that the "area in question is a portion of the city well-known for its gun play. Under the totality of the circumstances, particularly a report of a fight, it was reasonable for police officers to investigate whether or not the persons had firearms on their persons." Additionally, the trial court concluded that Locklear's comments about the gun and the rocks in his pocket were voluntary.
 {¶ 23} Locklear first argues that the gun should have been suppressed because there was no legal basis for a search of his person.
 {¶ 24} Appellate review of a suppression ruling presents a mixed question of law and fact. State v. Singleton, Cuyahoga App. No. 90003,2008-Ohio-3557, at ¶ 6-7. Accepting the *Page 7 
properly supported findings of the trier of fact as true, an appellate court must determine as a matter of law, without deference to the trial court's conclusion, whether the trial court erred in applying the substantive law to the facts of the case. Id. See, also, State v.Curry (1994), 95 Ohio App.3d 93, 96.
 {¶ 25} The Fourth and Fourteenth Amendments to the United States Constitution prohibit warrantless searches and seizures. Unless an exception applies, warrantless searches are per se unreasonable.Katz v. United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507,19 L.Ed.2d 576. One exception was announced by the United States Supreme Court in Terry v. Ohio, where the Court balanced the right to be free from unreasonable searches against the need to protect the police and the public. Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889. Under Terry, a police officer may frisk a detainee's outer clothing for concealed weapons when the officer has a reasonable suspicion that the suspect is armed and dangerous. Id. at 27.
 {¶ 26} The standard to perform an investigative search, like the standard for an investigatory stop, is an objective one based on the totality of the circumstances. Id. The proper inquiry is whether the officer reasonably determines that the detainee is armed and presently dangerous to the officer or others. State v. Hoskins, Cuyahoga App. No. 80384, 2002-Ohio-3451. Reasonable suspicion must be supported by specific and articulable facts and circumstances which, together with any rational inferences that may be drawn therefrom, reasonably support a conclusion that the detainee is armed and dangerous. State v.Stewart, Montgomery App. No. 19961, 2004-Ohio-1319. *Page 8 
 {¶ 27} Here, Detective Sims did not have a reasonable suspicion that Locklear was armed and dangerous when he searched him, because it is apparent from the record that appellant and the other men on the porch were searched within the first three minutes of the officers' arrival on the scene, without any assessment by the police of any suspicious criminal conduct or whether the individuals posed a risk to the police officers' safety. Detective Spencer testified that he got out of his car and immediately went to the back of the house to apprehend the male who had walked into the house. He testified further that he returned to the front yard, with that male in tow, after only one to two minutes.
Finally, he testified that while he was at the back of the house, during those one to two minutes, he heard Detective Sims yell "gun" after Sims found the gun in Locklear's pants pocket.
 {¶ 28} The only possible conclusion from Detective Spencer's testimony (supported by Locklear's testimony) is that after getting out of the car, Detective Sims immediately proceeded to the porch and searched the five men there-despite Detective Spencer's testimony that when the officers arrived at the house, they saw nothing other than 12-13 people "milling around" the porch and yard. Clearly, Detective Sims did not determine from the "totality of circumstances" he encountered upon arriving at the scene that the men on the porch were possibly armed and dangerous; he simply walked up and started searching them. But we do not have martial law in the United States; the Fourth Amendment requires reasonable suspicion, supported by articulable facts, based upon the totality of the circumstances, to justify a warrantless intrusion upon "the sanctity of the person." Terry at 16. *Page 9 
 {¶ 29} That the house was located in a high-crime area "do[es] not diminish the requirements of the Fourth Amendment or its interpretation in Terry. The facts and circumstances before the officer must yet reasonably suggest that some specific criminal misconduct is afoot. That specificity requirement focuses on the criminal character of the act, not on its setting. Acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high-crime area. Acts that are not specifically criminal in character do not become criminal because they are inapposite to their setting and, therefore, `suspicious.' The setting can inform the officer's judgment, but it does not make the act criminal. In order to detain an individual to investigate for crime, some nexus between the individual and specific criminal conduct must reasonably exist and must be articulated by the officer." State v. Maldonado (Sept. 24, 1993), 2nd Dist. No. 13530.
 {¶ 30} There was no nexus between Locklear and any suspicious criminal conduct. Even assuming, for the sake of argument, that Locklear and the other individuals were not searched immediately when the police arrived (as they undoubtedly were), none of the reasons given by Spencer for the pat-down were sufficient to create a reasonable suspicion that Locklear was armed and dangerous.
 {¶ 31} Detective Spencer asserted that the officers searched all of the individuals at the scene because the one male's act of turning and walking into the house when he saw the police was "indicative of drug activity" and "along with drug dealing, comes weapons." Admittedly, the nexus between drugs and guns can create a reasonable suspicion of danger to an officer. See State v. Hunter, 2nd Dist. No. 20917,2006-Ohio-2678, at ¶ 11, quoting United *Page 10 States v. Sakyi (C.A. 4, 1998), 160 F.3d 164, 169. When investigating drug activity, officers have a legitimate concern for their own safety, and that concern can justify a pat-down search for weapons. State v.Thompson, 1st Dist. No. C-050400, 2006-Ohio-4285, at ¶ 11, citing State v. Martin, 2nd Dist. No. 20270,2004-Ohio-2738.
 {¶ 32} But the officers did not observe any drug activity here. Detective Spencer's assertion that the male's act of turning and walking into the house when he saw the police cars pull up was "indicative of drug activity" is utterly preposterous. Spencer testified that he also saw the neighbors go into their house when the police pulled up; should he have immediately searched them too because their behavior was indicative of drug activity? This court has held that absent observation of other suspicious behavior, the mere fact that a person walks briskly away when the police approach does not justify an investigative stop or subsequent pat-down. State v. Fanning (1990), 70 Ohio App.3d 648, 650. Because there was no testimony of any suspicious behavior indicating drug activity, the fact that one individual walked into the house upon the police arrival did not create reasonable suspicion sufficient to justify a pat-down search of everyone on the scene.
 {¶ 33} Detective Spencer also testified that the officers decided to search everyone because they did not believe that the two individuals who claimed to live at the house actually lived there. This too is not a legal basis for a pat-down search.
 {¶ 34} The police in this case responded to an anonymous complaint of a fight, drug activity and loud music. Standing alone, an anonymous tip is insufficient to support reasonable suspicion for an investigative stop, because it lacks the necessary indicia of *Page 11 
reliability. Alabama v. White (1990), 496 U.S. 325, 329, 110 S.Ct. 2412,110 L.Ed.2d 301. Anonymous tips may provide the reasonable suspicion necessary to make an investigatory stop if sufficiently verified bypolice officers. State v. Campbell (1990), 68 Ohio App.3d 688. But in this case the intrusion by the police was not corroborated by any independent observations of suspected illegal activity.
 {¶ 35} When they arrived at the house, by Detective Spencer's own testimony, no one was fighting and there was no loud music. Furthermore, with the exception of the one individual who walked into the house, according to Detective Spencer, "the crowd was just standing there" and no one made any suspicious movements. Tellingly, Detective Spencer also testified that when he came around from the back of the house with the male, "we still hadn't seen anything concrete." Nevertheless, according to Detective Spencer, the police searched everyone.
 {¶ 36} Apart from the general reputation of the area, nothing connected Locklear (or for that matter, anyone else at the scene) to any crime. "While the greater incidence of crime in an area is likely to make searches performed there more productive of arrests, that corresponding probability permits no greater governmental intrusion than the Fourth Amendment allows elsewhere. In all instances, absent a warrant, the facts before the officer must reasonably suggest that some specific criminal misconduct is afoot. Otherwise, law enforcement officers may not invade the right to personal security and privacy that the Fourth Amendment was designed to protect." Maldonado at [*10], citing U.S. v. Porter (C.A.8, 1987), 818 F.2d 679, certiorari denied484 U.S. 1006 (1984). This court has a long *Page 12 
history of concern for officer safety, and we tend to credit any legitimate fact or circumstance that justifies a weapons pat-down. However, the record must contain evidence that the officer was reasonably in fear for his safety and that fear must be substantiated by some form of objective fact, even in a circumstantial way. See State v.Prevo, Cuyahoga App. No. 88968, 2007-Ohio-5452, at ¶ 23. Because the record in this case does not contain any facts or circumstances to suggest that, under the totality of the circumstances, the officers had a reasonable suspicion of criminal activity or were justified in believing that Locklear was armed and dangerous, we conclude that the warrantless search of Locklear was in violation of Terry, and thus was illegal. "Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and in fact could leave." State v.Robinette, 80 Ohio St.3d 234, 241, 1997-Ohio-343. It is apparent that when Detective Sims came up to the porch with his hand on his gun and ordered everyone to put their hands on the wall to be searched, a reasonable person would not have felt free to leave. Because Locklear was illegally detained for the search, and a reasonable person would not have felt free to leave the porch, his statement that he had a gun in his pocket did not amount to consent to the search. Thus, the trial court erred in not suppressing the gun.
 {¶ 37} Appellant's first assignment of error is sustained.
 {¶ 38} Locklear next argues that the trial court should have suppressed the drugs found in his pocket because he was not advised of his Miranda rights before Detective *Page 13 
Spencer questioned him. It is well-settled that a suspect must be advised of his constitutional right against self-incrimination before being questioned by law enforcement. Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; State v. Foust, 105 Ohio St.3d 137,2004-Ohio-7006. The record does not contain credible evidence that Locklear was advised of his rights. Although Detective Spencer testified that he assumed that someone advised Locklear of his rights, Spencer admitted that he did not know if anyone had so advised Locklear. In light of the other inconsistencies in Detective Spencer's testimony, and Locklear's testimony that no one gave him his rights, on this record, we cannot conclude that Locklear was advised of his constitutional rights prior to being questioned by Detective Spencer. Therefore, we hold that the statement was obtained illegally and should have been suppressed by the trial court.
 {¶ 39} Appellant's second assignment of error is sustained. His conviction is vacated and the matter is remanded to the trial court for further proceedings. It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 14 
ANN DYKE, J., CONCURS IN JUDGMENT ONLY KENNETH A. ROCCO, P.J., DISSENTS WITH OPINION